**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| KOURTNEY SHELLEY, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION NO. 5:18-CV-380 (MTT) |
| | ) |
| | ) |
| WESLEYAN COLLEGE, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

Defendant Wesleyan College moves for summary judgment.  For the following

reasons, that motion (Doc. 28) is **GRANTED**.

## I. BACKGROUND[1] [2]

Kourtney Shelley, an African American female, began working for Wesleyan as a

Transfer Support Coordinator on November 27, 2017.  Docs. 1 ¶ 8; 28-2 ¶ 8.  Clint

Hobbs, Vice President for Strategic Enrollment Management, was Shelley's immediate

supervisor.  Docs. 28-2 ¶¶ 2, 9; 28-4 at 9:9-10.  Hobbs believed that Shelley was the

most qualified applicant based on her experience.  Doc. 28-2 ¶ 6.  Hobbs assigned

---

[1] Shelley's filings make for a record difficult to understand.  The Court notes for clarity that Document 37
is a complete copy of Shelley's response brief, Document 38-4 is her Statement of Undisputed Material
Facts, and Document 37-1 is Shelley's response to Wesleyan's Statement of Undisputed Material Facts.

[2] As required, the Court has "review[ed] the movant's citations to the record to determine if there is,
indeed, no genuine issue of material fact."  *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008)
(citation and quotation marks omitted).  Because Shelley is proceeding pro se, the Court construes
Shelley's pleadings liberally and has undergone a full analysis of her claims for relief.  Unless otherwise
stated, all facts are undisputed.  If a material fact is disputed, the Court draws all justifiable inferences in
Shelley's favor.

Shelley's training to Katrina Skalko, and Skalko was to train Shelley on "[e]verything top to bottom."  *See* Docs. 28-3 at 10:1-13; 28-2 ¶ 15.  Hobbs said that Shelley's training would last "as long as it took," but that proved not to be very long.  Doc. 28-3 at 38:8-11.  After a tumultuous forty-two days, Wesleyan terminated Shelley on January 8, 2018.  Doc. 28-2 ¶ 27.

Shelley's version of the events leading to her termination is mostly conclusory and primarily focuses on Skalko, who, Shelley claims, bullied and harassed her, mostly by email.  Apart from the emails, Shelley recounts specific instances of what she considered Skalko's bullying.  During her first week, Shelley worked an open house event with Skalko.  Doc. 28-10 at 27:23-28:18.  After the event, Shelley claims that Skalko threw a box at Shelley's feet and asked her to take it to a conference room.  *Id*.  On another day, while Shelley prepared to leave work, Skalko asked Shelley where she was going.  *Id*. at 25:8-23.  Shelley answered, "I'm going to get my kids."  *Id*.  Skalko then told Shelley that she "need[ed] to get a babysitter[.]"  *Id*.

Shelley also attaches significance to her opposition to what she thought was an "unethical" grade point average conversion policy.  Docs. 28-10 at 226:7-227:19, 306:15-307:25; 38-7 at 13.  Apparently to cover herself, Shelley emailed Skalko on December 7, asking for "something in writing" to show that she had been "instructed" to follow the policy.  Doc. 38-7 at 13.  Skalko responded that the policy had been agreed to by the involved schools.  *Id*.  At the time, Shelley was satisfied with that response.  *Id*.

Skalko and Hobbs paint a much different picture.  Hobbs said that during her brief tenure, Shelley often arrived late to work and left early.[3]  Doc. 28-2 ¶ 14.  Skalko said that Shelley's absenteeism forced her to "work[] nights and weekends … to make up the work that was not being done" by Shelley.  Doc. 28-3 at 16:10-15.  Hobbs stated that Shelley "was frequently absent from her workspace during the workday without communicating her whereabouts with [Hobbs] or other staff members."  Doc. 28-2 ¶ 13.

In numerous emails, the emails Shelley claims were bullying, harassing, and discriminatory, Skalko attempted to document these and other problems that arose as she attempted to train Shelley.[4]  Doc. 38-7 at 14, 16-20, 22-25.  On December 8, 2017, Skalko emailed Shelley because Shelley had failed to document her contact with a student.  *Id*. at 14.  Skalko's email stated that she had spoken with a student only to learn the student had already talked with Shelley.  *Id*.  On December 13, Skalko emailed Hobbs about four issues she had experienced with Shelley so far that day.  *Id*. at 16.  Skalko concluded: "Bottom line: I just don't have time to continuously track her down and try to encourage her to do any work."  *Id*.  Another email sent later that day discussed Shelley's delay in returning messages and other unfinished work.  *Id*. at 17.

On December 20, Skalko emailed Shelley about using a certain template "when communicating with students by email or phone … to ensure that portions of their process aren't left out."  *Id*. at 18.  Skalko concluded the email by saying that she did not

---

[3] Shelley testified that she talked with Hobbs about her need for a flexible schedule due, in part, to having two small children.  Doc. 28-10 at 173:20-174:25.

[4] In her response brief, Shelley also asserts these emails were "fabricated."  Doc. 37 at 2, 10.  To the extent Shelley means to suggest that the emails were concocted after the fact, that suggestion has no basis in the record.  The Court assumes Shelley means that she disputes Skalko's version of events recounted in the emails.

mind helping Shelley as she trained.  *Id.*  In a December 22 email, Skalko again reminded Shelley about making notes after speaking with students to avoid miscommunication.  *Id.* at 20.  Skalko also asked Shelley to copy her "on all emails to students so that [they could] work together to be sure … [they were not] communicating incorrect information to students."  *Id.*

As for Hobbs, he testified that despite his expectations based on her experience, "[Shelley] did not engage in the training process and did not catch on to the responsibilities of her job."  Doc. 28-2 ¶ 11.  Hobbs also stated that Skalko informed him of Shelley's "frequent mistakes like providing prospective students with incorrect information about deadlines and required admission documentation."  *Id.* ¶ 17.  He claimed that Shelley's mistakes "had the potential to affect prospective students' admissions prospects and Wesleyan's opportunity to enroll those students."  *Id.* ¶ 18.  Hobbs testified that he first met with Shelley concerning her job performance on December 8, 2017.  *Id.* ¶ 21.  For her part, Shelley testified that Wesleyan never provided her with a performance evaluation.  Doc. 28-10 at 160:1-11.  She did say, however, that she complained to Hobbs about Skalko's behavior.  *Id.* at 317:13-318:6.  Either way, it is undisputed that things, even early in Shelley's employment, were not going well.

By all accounts, things came to a head on January 4, 2018, when five separate emails were sent between and among Skalko, Hobbs, and Shelley.  Doc. 38-7 at 23-25.  Skalko sent the first one at 3:29 p.m., telling Hobbs about Shelley's absence when a student arrived to speak with Shelley.  *Id.* at 23.  Eleven minutes later, Skalko asked Shelley to take some files to Wesleyan's Registrar's office and Business office.  *Id.* at

24.  Shelley outright refused the request, emailing Skalko that she was "going to let

[Skalko] do the honor of taking the files[.]"[5]  *Id.*

Skalko sent the fourth email at 5:45 p.m., which the Court quotes in full:

Hi Kourtney!
After delivering files to the Registrar's office, I came back to touch base
with you on the below but someone said you'd slipped out the
handicapped access back door.

Since my request on 12/21 that you cc me on *all* non-trad[itional] student
emails you send, I haven't received even one.  Am I to understand that
you have had no email contact with any students since 12/21?  I continue
to run across misinformation sent to students in notes and want to be sure
we're going over details for each student's specific account so that we
don't continue to give out incorrect or incomplete information.

Also, as we discussed previously on several occasions, please be sure to
use the Non-Trad[itional] templates in WesShare for any email
communications with students, as these have been built to ensure the
appropriate information is sent out at the appropriate time for each
student.

Please let me know *as soon as you get in the office* Friday so that we can
go over whatever you are working on currently.  I'm not sure what you
worked on for most of the day today, which is preventing me from being
able to further train you on our processes, which we still haven't been able
to work on.  Consequently, I'm having to stay late again tonight to work on
items that should have been done earlier today.  Tomorrow … will be the
final day before classes start and I *really* need your help in focusing on
finishing out spring students as a first priority above anything else.

Thanks

*Id.* at 25.  This email led to an 8:46 p.m. email from Shelley to Hobbs asking for a

meeting.  *Id.*  Although this email makes no mention of it, Shelley claims that her intent

---

[5] Shelley states, in her response to Wesleyan's statement of undisputed facts, that Skalko, by assigning
tasks of this nature, reduced Shelley's worth "to that of [Skalko's] personal slave[.]"  Doc. 37-1 at 7.  This
argument seems to confirm that Shelley bridled at performing tasks she felt beneath her.  Skalko testified
that "it was not unusual for anybody to run something across campus."  Doc. 28-3 at 26:1-2.  Skalko and
other employees delivered documents to the Registrar's office when necessary.  *Id.* at 26:7-19.

was to seek mediation to address what Shelley believed to be Skalko's harassment. Doc. 37 at 15.

But Hobbs claims he, at that point, had seen enough.  He thought it best to terminate Shelley "sooner rather than later because of the many difficulties that had arisen in such a short time and because of the lack of progress with her training."  Doc. 28-2 ¶ 24.  Shelley claims that Hobbs "cannot give a valid reason for firing [her] and does not recall what [he] actually told [Shelley] when firing her."  Doc. 37-1 at 9.  But the record is clear that Shelley's job performance was Wesleyan's stated reason for terminating Shelley.  Doc. 28-2 ¶¶ 22-27.  After consulting with Meagon Davis, Wesleyan's Human Resources Director, Hobbs decided to fire Shelley.  *Id.* ¶ 25.

On January 8, 2018, Hobbs and Davis met with Shelley to terminate her employment due to "poor job performance and failure to meet job expectations."  *Id.* ¶¶ 26-27.  After terminating Shelley, Wesleyan did not refill her position.  Doc. 28-9 at 9:8-23.  Instead, they eliminated Shelley's position through a reorganization.  *Id.*

## II. SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of

-6-

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III. ANALYSIS

Shelley's complaint asserts two claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981: (1) race discrimination and (2) retaliation. Although the complaint does not assert a hostile work environment claim, the parties nonetheless address one. Docs. 1 at 2; 28-1 at 17-20; 37 at 16; 40 at 9-10.

42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts." The statute prohibits intentional racial discrimination in employment contracts. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318 (11th Cir. 1998). Claims under § 1981 have the same proof requirements and are subject to the same analytical framework as claims under Title VII. *Id.* at 1330.

When Wesleyan filed its motion for summary judgment, it assumed Shelley would not rely on direct evidence to prove her claims. That assumption was well-founded. During discovery, particularly during Shelley's deposition, Wesleyan seemingly established, conclusively, that Shelley had no direct evidence of race discrimination. Doc. 28-10 at 207:10-208:19, 225:22-226:6. But in the 532 pages of her response to Wesleyan's motion, Shelley attempts to prove racial animus through largely undisclosed "evidence" that falls in the category of direct evidence. Docs. 37; 38. However, it falls in that category only because there is no other place to put it. Certainly, it has no relevance to *McDonnell Douglas* analysis. Accordingly, the Court discusses that "direct" evidence separately.

-8-

Absent direct evidence of intentional discrimination, a Title VII or a § 1981 plaintiff may prove her case circumstantially.  The framework for analyzing circumstantial evidence to establish discrimination is found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the elements of which vary depending on the nature of the claim.  If a plaintiff establishes that prima facie case, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  This burden of production means the employer "need not persuade the court that it was actually motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Id.* at 254.  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity."  *Id.* at 255 (footnote omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is a pretext for discrimination.  This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* at 256.  "If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer."  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1309 (11th Cir. 2012).

## A.   Race Discrimination

### 1.   Direct evidence

Direct evidence is that which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (quotation marks and citations omitted). Direct evidence of employment discrimination shows, without inference, that a decisionmaker was motivated by illegal reasons, like racial animus, in making an adverse employment decision. *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1236 n.5 (11th Cir. 2016); *Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 F. App'x 936, 940 (11th Cir. 2010) (citations omitted); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). Isolated remarks that are "unrelated to the challenged employment decision" do not constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002). And "[i]f an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999). Thus direct evidence is limited to "[o]nly the most blatant remarks" that can only be interpreted to show that the *decisionmaker* was motivated to "discriminate on the basis of some impermissible factor[.]" *Quigg*, 814 F.3d 1227, 1242 n.11 (emphasis added) (quoting *Wilson*, 376 F.3d at 1086); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("We have held that statements that are open to more than one interpretation do not constitute direct evidence of racial discrimination.") (citation omitted).

As noted, Wesleyan went to considerable lengths to establish that Shelley had no direct evidence that Wesleyan terminated her based on her race.  Doc. 28-10 at 207:10-208:19, 225:22-226:6.  Shelley, for example, specifically denied knowledge of any Wesleyan employee's statement that she "believe[s] suggests racial discrimination" other than the ones discussed in her deposition.  *Id.* at 207:20-208:7.  However, Shelley argues, for the first time, in her response brief that a Wesleyan employee called her a "'Harriet Tubman, Aunt Jemima wanna be.'"  Docs. 37 at 11; 37-1 at 10.  But Shelley never disclosed that alleged comment in her deposition or at any other time during discovery.  Docs. 28-10; 37-1 at 10.  This is but the first example of "evidence" Shelley first raises in her response brief—and in a surreply brief which the Court did not allow.  Docs. 44; 45.  Of course, Shelley's assertions in her brief are not evidence, and even if they were, the Court would not consider them.  At the risk of making too much of the alleged "Harriet Tubman/Aunt Jemima" comment by a non-decisionmaker, the Court explains why.

Generally, "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition."  *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).  Nevertheless, in *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984), the Eleventh Circuit recognized an exception to the general rule, allowing the district court, in appropriate circumstances, to disregard a "sham" affidavit that is inherently inconsistent with a party's prior deposition testimony.  *See id.* at 657-59.  The sham affidavit exception is applied "sparingly because of the harsh effect [it] may have on a party's case."  *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525,

1530 (11th Cir. 1987).  Further, not every discrepancy between an affidavit and earlier testimony renders the affidavit a sham.  Rather, courts must distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.  An opposing party's affidavit should be considered although it differs from or varies from his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) (quotation marks omitted) (citing 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985)).  "Variations in a witness's testimony [short of inherent inconsistency] and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.  Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact." *Tippens*, 805 F.2d at 954.

Here, the "sham" is not an affidavit but an argument in Shelley's response brief that directly conflicts with her sworn testimony.  But even if Shelley had sworn that a Wesleyan employee made the comment, the Court would reject that evidence as a transparent sham.  First, Shelley offers no excuse for her failure to disclose the comment during discovery.  On the contrary, she falsely states in her brief that she did disclose it in her deposition.  Second, given the importance Shelley ascribes to the comment, it is inconceivable that she somehow would have forgotten the comment when Wesleyan's lawyer probed closely for such evidence.  And third, the comment is wholly inconsistent with Shelley's deposition testimony that such comments were never made.  *See generally* Doc. 28-10.  In any event, the alleged comment is not direct

evidence that Wesleyan terminated Shelley because of her race.  It was a remark by a co-worker who had nothing to do with Shelley's termination.

From that specific assertion, Shelley proceeds in her response brief to hurl more general allegations of alleged historical racism at Wesleyan, allegations totally unrelated to her employment.  She argues, for example, that "Wesleyan College condones racism among staff and students."  Doc. 38-4 at 2.  But the unauthenticated article Shelley cites actually concerns the reinstatement of a student Wesleyan had expelled for allegedly posting racist remarks after receiving information exonerating the student.  Doc. 38-8 at 13-15.  Moreover, the article highlights Wesleyan's creation of a cabinet-level position tasked with "help[ing] fight racism on campus and allow[ing] diverse voices to be heard." *Id.*  Also, the article quotes Wesleyan President Dr. Vivia Fowler's insistence that "[t]here is no place for racism at Wesleyan College."  *Id.*  If anything, the article demonstrates Wesleyan's efforts to ensure an environment free of racism.  But it has no relevance to Shelley's case.

Shelley also argues that "Wesleyan College had a strong reliance on and endorsed white privilege and white supremacy as a ritual."  Doc. 38-4 at 2.  She claims that Fowler "agrees that there is a racist dogma at the college."  *Id.* at 3.  Again, these new allegations are irrelevant.  And again, Shelley's claimed basis for leveling these accusations is false.  Fowler actually discussed Wesleyan's racial reconciliation process, and part of that process included conversations *about* white privilege and supremacy.  Doc. 38-11 at 15:11-16:3.

Finally, Shelley attempts to draw upon ancient events to support her claim, but of course, those events are not direct evidence of racial discrimination against *Shelley*.

Docs. 37-5 at 48-103; 38-4 at 2.  Shelley, for example, asked Fowler, "Was I hired to alleviate backlash that the college received due to ties with the KKK?"  Doc. 38-11 at 9:1-3.  There is not, of course, any evidence that anything in Wesleyan's history had anything to do with Shelley's termination, and Shelley's deposition testimony establishes that she cannot draw a connection between those historical events and her employment.  *See generally* Doc. 28-10.

In short, as Shelley admitted in her deposition, she has no direct evidence supporting her race discrimination claim.  Therefore, its survival depends on circumstantial evidence analyzed through the *McDonnell Douglas* framework.

### 2.  *McDonnell Douglas Framework*

#### a.  Prima facie case

Wesleyan argues the traditional prima facie case applies to Shelley's race discrimination claim.  "To prevail on a claim for discrimination under Title VII based on circumstantial evidence, [Shelley] must show that: (1) [she] is a member of a protected class, (2) [she] was qualified for the position, (3) [she] suffered an adverse employment action, and (4) [she] was replaced by a person outside [her] protected class or was treated less favorably than a similarly situated individual outside [her] protected class." *Maynard v. Bd. Of Regents of Div. of Universities of Florida Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citation omitted).

Shelley is a member of a protected class, Wesleyan does not dispute that Shelley met the basic qualifications for her position, and Wesleyan fired her.  As for the

fourth prong, Shelley makes no effort to establish a comparator.[6]  The question then, as Wesleyan sees it, is whether Shelley has established that a person outside her protected class replaced her.  The parties provide little help in answering that question. Wesleyan argues that Shelley was not replaced because "her position was eliminated in conjunction with a restructuring of the Admissions and Registrar's Office."  Doc. 28-1 at 11.  They support this assertion with a citation to a single page of Shelley's cross-examination of Meagon Davis.  Docs. 28-1 at 11; 28-9 at 9:7-23.  About all that can be gleaned from Davis's testimony is that the duties Shelley performed were assigned to other employees.  Then, Wesleyan argues that Shelley admitted in her deposition "that she has no evidence that she was replaced by an individual of another race."  Docs. 28-1 at 11; 28-10 at 227:11-15.  On the latter point, Wesleyan strays a bit from what Shelley actually admitted.  The question posed was whether Shelley had any evidence that "the title [she] had, Transfer Student Coordinator—was filled with an individual of another race?"  Doc. 28-10 at 228:12-14.  Obviously if, as Wesleyan contends, that position was eliminated, no one was hired to fill that position.  Nonetheless, Wesleyan concludes that Davis's testimony and Shelley's admission establishes that Shelley cannot show she was replaced by someone outside her class and therefore cannot establish the fourth prong of her prima facie case of race discrimination.

---

[6] Shelley wrote "None" on her Equal Employment Opportunity Commission Intake Questionnaire when asked to list anyone in the same or similar situation whom Wesleyan treated better.  Doc. 37-5 at 40. Nevertheless, Shelley states in her brief, without elaboration, that she was treated less favorably than Skalko, who Shelley said was "a similarly-situated individual."  Doc. 37 at 14-15.  The Court does not take this as an effort to demonstrate a comparator for the purpose of establishing a prima facie case.  Skalko, as Shelley's trainer, is clearly not a valid comparator.  *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019)

As for Shelley, she does not even address in her response brief whether she was replaced.  Apparently recognizing the challenge of satisfying the replacement prong of the traditional prima facie case, she suggests a variation sometimes used when a plaintiff was not replaced.  Shelley contends that the relevant fourth prong is whether "the termination occurred under circumstance giving rise to an inference of discrimination."[7]  Doc. 37 at 14.  But, in her brief, Shelley makes no effort to establish that prong of a modified prima facie case.  Nor could she.  While the record clearly shows that Skalko found Shelley's performance deficient and made her criticisms clear, much to Shelley's dissatisfaction, there is nothing that would support an inference that Skalko's hostility/harsh treatment, assuming that is what it was, was in any way based on Shelley's race.  And even more clearly, there is no circumstance inferring that Hobbs, the decisionmaker, acted out of racial animus.

But in her statement of undisputed facts and her response to Wesleyan's statement of undisputed facts, Shelley attempts to respond to Wesleyan's contention that she was not replaced.  *See generally* Docs. 37-1; 38-4.  First, in response to Wesleyan's asserted undisputed fact that Shelley had no evidence that she had been replaced by an individual of another race, Shelley acknowledged that her position had been eliminated but asserted "the person Hobbs hired to fulfill the same job duties as

---

[7] The non-binding precedent Shelley cites for this modified prima facie case is not directly on point. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344 (3d Cir. 1999) (finding harmless an erroneous jury instruction that the terminated employee had to prove that she was replaced by a male); *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997) (affirming summary judgment, in part, because the employee failed to provide a valid comparator).  However, the substance of her modified fourth prong is used in this Circuit when a plaintiff has not been replaced.  For example, when an employee loses her job because of a reduction in force, she can establish a prima facie case of age discrimination by "produc[ing] evidence, circumstantial or direct, from which the factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue."  *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1557 (11th Cir. 1987).

plaintiff is a white female – Jessica L. Tucker (enrollment coordinator). (Davis Dep. at 9:3-23)."[8]   Doc. 37-1 at 9.   Nowhere in Davis's deposition, the cited basis for Shelley's assertion, did Davis say anything remotely suggesting that Wesleyan hired a white female to perform Shelley's duties or even that her duties were reassigned to a white female.   In her statement of undisputed facts[9], Shelley similarly asserts that her position "was renamed Enrollment Coordinator and filled by a Caucasian-American female – Jessica Tucker. (Davis. at 9:18-23.)."   Doc. 38-4 at 9.   But here, Shelley goes on to provide two hyperlinks to Wesleyan's website.   One is to the campus directory.   The purpose of this "citation"[10] is not clear.   Perhaps Shelley meant for the Court to find Tucker in the directory and confirm that her position is enrollment coordinator.   For what it is worth, the directory confirms that.   The other hyperlink leads to Wesleyan's Office of Transfer and Non-Traditional Enrollment, which identifies, and pictures, Jessica Tucker as Wesleyan's Enrollment Coordinator, who clearly is white.   That is as far as Shelley goes to establish that a "white female" replaced her, and it is not far enough.   Jessica Tucker is an Enrollment Coordinator, and she is white.   But Shelley cites no evidence that, as she claims, Wesleyan "hired [Tucker] to fulfill the same job duties as plaintiff."   Doc. 37-1 at 9.   Indeed, the only evidence she cites—Davis's deposition testimony— undercuts that assertion.   *See generally* Doc. 28-9.

---

[8] This is the testimony from Davis's deposition upon which Wesleyan relies.

[9] It is not clear why Shelley, a nonmovant, filed a statement of undisputed facts.

[10] The website is not in the record but given Shelley's pro se status and the absence of a specific objection, the Court will consider it.

Of course, based on her brief, Shelley is not resting on her replacement argument to establish the fourth prong of her prima facie case, but rather on circumstances inferring discriminatory termination.  That perhaps explains why Shelley leaves the record where it is on the question of who assumed her duties.  And presumably she assumed that her allegations of Skalko's bullying were sufficient to give rise to an inference of race discrimination.  But as discussed, they are not.

In sum, Shelley has not established a prima facie case of race discrimination.

### b.  Legitimate non-discriminatory reasons

Even if Shelley had made a prima facie case of race discrimination, Wesleyan has advanced legitimate, non-discriminatory reasons for terminating Shelley.  Doc. 28-1 at 12.  First, Wesleyan points to Shelley's lack of engagement with her training progress, failure to follow instructions, and the excessive time Shelley took to complete various tasks as grounds for her termination.  *Id.*  Second, Wesleyan argues that Shelley was "consistently tardy, left early, and was generally unavailable for training purposes."  *Id.*  Third, Wesleyan says that Shelley "refused to complete tasks that she deemed below her, such as taking documents to another office on campus."  *Id.*  Wesleyan also points to Shelley's "mistakes in communications with prospective students and documenting prospective student communication, crucial parts of her job."  *Id.*  The bases for these reasons were well-documented throughout Shelley's brief tenure.  Docs. 28-2 ¶¶ 26-27; 38-7 at 14-20, 22-25.

### c.  Pretext

To show pretext, Shelley, other than putting a conclusory label of "baseless" on Wesleyan's legitimate, non-discriminatory reasons, raises a single point.  Doc. 37 at 17.

She argues that "Hobbs initially advised Plaintiff was being fired because she was 'not a good fit.'"  *Id.*  But when Shelley received her termination letter, the stated reason was "Failure to Perform Job Duties as Assigned."  *Id.*  Citing *Velez v. Thermo King*, 585 F.3d 441 (1st Cir. 2009), Shelley takes this as differing reasons for her termination sufficient to establish pretext.  Doc. 37 at 16-17.  That argument is factually and legally flawed, as *Velez* itself demonstrates.

In *Velez*, the plaintiff was fired after an internal investigation of his report that expensive company property was missing.  585 F.3d at 444-46.  The plaintiff was not initially provided a reason for his termination.  *Id.*  But one month later, the defendant said it fired the plaintiff for accepting gifts from suppliers.  *Id.* at 446.  Responding to the plaintiff's suit one year later, the defendant said it fired the plaintiff for selling company property to other employees and selling items he received from suppliers and vendors.  *Id.*  The court found "several aspects of evidence" supporting a genuine issue of material fact.  *Id.* at 449.  Specifically, the defendant's "shifting explanations," uncertainty over whether the plaintiff had violated company policy, and, most importantly, the defendant's more favorable treatment of younger employees, all suggested pretext.  *Id.*  Addressing the defendant's shifting reasons, the court found that the defendant's "different reasons at different times for its action surely supports a finding that the reason it ultimately settled on was fabricated."  *Id.*  As to the defendant's vague policy, the court found that a rational jury could find that the plaintiff's actions did not violate company policy because it did not apply to small-value items the plaintiff admitted to selling.  *Id.* at 450.  Finally, the court found persuasive, evidence that the

defendant did not fire younger employees who were complicit in the sale of company property.  *Id.*

Here, unlike the defendant in *Velez*, Hobbs gave Shelley reasons for her firing—according to Hobbs, poor job performance and failure to meet job expectations.  Doc. 28-2 ¶¶ 26, 27.  While Shelley claims Hobbs said she wasn't a good fit, he still gave reasons for her termination and they do not conflict with the reasons stated in the separation notice, certainly not to the extent necessary to demonstrate pretext. Moreover, that Wesleyan had multiple documented reasons for terminating Shelley does not establish pretext.  *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998) (holding that the existence of additional, nonconflicting reasons for termination does not prove pretext).  And Wesleyan's multiple reasons are not at all inconsistent; they all have one common and well-documented thread—Shelley's job performance. Docs. 28-2 ¶¶ 26, 27; 38-7 at 14-20, 22-25.

Accordingly, Shelley has not proved that Wesleyan's legitimate, non-discriminatory reasons for her termination are pretextual.  Thus, Wesleyan is entitled to summary judgment on Shelley's race discrimination claim.

**B.  Retaliation**

Shelley does not argue that she has direct evidence of retaliation, so the Court evaluates that claim using the *McDonnell Douglas* framework.  "[T]he *prima facie* case for retaliation requires the employee to show that: (1) [she] engaged in a statutorily protected activity; (2) [she] suffered an adverse employment action; and (3) [she] established a causal link between the protected activity and the adverse action."  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181-82 (11th Cir. 2010) (citation omitted).

-20-

In this case, if statutorily protected activity occurred, it would fall under the opposition clause, which makes it unlawful for any employer to discriminate against an employee who opposes any practice made unlawful by § 2000e-3. *Crawford v. Nashville*, 555 U.S. 271, 276 (2009).  "Title VII's protections are not limited to individuals who file formal complaints, but extend to those who voice informal complaints as well." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citations omitted).  Moreover, a plaintiff must show that she "'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Id.* (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

Construed liberally, Shelley's retaliation claim centers on two things.  The first is her opposition to Wesleyan's GPA conversion policy.  Shelley argues that she experienced "unwarranted belittlements" and discriminatory treatment after complaining about the GPA conversion policy.  Doc. 37 at 9.  The second involves her request for mediation after receiving Skalko's January 4, 2018 email.  *Id.* at 15.  But instead of meeting with Shelley to resolve that issue, Shelley says Hobbs fired her.  *Id.* at 16.

1. *Wesleyan's GPA conversion policy*

Shelley has not shown that she engaged in statutorily protected activity when she voiced opposition to Wesleyan's GPA conversion policy.  At most, Shelley raised concerns over what she believed to be an unethical policy.  Doc. 38-7 at 13.  In a December 7, 2017 email, Shelley asked Skalko to "send [her] something in writing (via email is fine) stating that I do not have to convert Georgia Military College (GMC) transfer students from Quarter to Semester in the GPA Calculations.  If we are ever audited, I would like to have something showing that I was instructed to perform this

-21-

task[.]" *Id.*  Skalko responded that the policy was, in fact, compliant, and that Wesleyan and Georgia Military College had agreed to the policy.  *Id.*  Regardless of whether the GPA conversion policy was "ethical," it is not an employment practice, and Shelley's complaints about that policy were not in opposition to a perceived "unlawful employment practice."  *Furcron*, 843 F.3d at 1311.  Therefore, Shelley has not established that she engaged in statutorily protected activity.  Accordingly, Shelley cannot establish a prima facie case of retaliation based on her complaints about Wesleyan's GPA conversion policy.  If anything, Shelley's contention that Skalko, because of Shelley's complaints about the GPA conversion policy and her demand for a covering instruction before applying the policy, fabricated reports of Shelley's deficiencies to "create a paper trail" for her "exit," undercuts her claim that she was fired because of her race.  Doc. 37 at 10.

  *2.   Termination after complaining about Skalko's conduct*

  In her response brief, Shelley argues that after she received Skalko's January 4, 2018 email, she "realized she was unable to stop the constant harassment, bullying and discriminatory comments."  Doc. 37 at 15.  She forwarded Skalko's email to Hobbs, and only Hobbs, with the message, "I would like to meet with you and Katrina."  Doc. 38-7 at 25.  That is all the email to Hobbs says, but in her brief, Shelley states that she sent the email to Hobbs and Registrar Angie Wright with a "request for a second meeting to include all parties and Defendant Skalko for mediation."  Doc. 37 at 15. Shelley claims Hobbs then fired her.  *Id.* at 16.

  Putting aside Shelley's conflicting claim that Skalko's harassment resulted from Shelley's criticism of the GPA conversion policy and her incorrect description of her one-sentence email to Hobbs, the Court assumes that Shelley claims Wesleyan fired

her in retaliation for her complaint about a "hostile work environment" evidenced by Skalko's January 4 email.  But, once again, Shelley argues conclusions, not facts, and her conclusory arguments do not establish that her complaints about Skalko's email was statutorily protected activity.  It is not enough for Shelley to merely say that Skalko's behavior was a form of bullying and harassment.  The record "must also indicate that the belief … was objectively reasonable."  *Little*, 103 F.3d at 960.  Applying an objective reading to not only the January 4 email, but to *all* of Skalko's emails to Shelley, no employee in good faith could say that Skalko's comments constituted bullying or harassment.  Docs. 28-5; 28-6; 28-8; 38-7 at 13, 14.  Certainly, nothing in the emails suggests anything in the nature of race discrimination.  Doc. 38-7 at 13, 14, 18, 20, 24, 25.  While no doubt Skalko's emails were not pleasant reading for Shelley, her expression of discontent with Skalko's assessment was not statutorily protected activity.

Even if Shelley could establish a prima facie case of retaliation based either on her complaints about Wesleyan's GPA conversion policy or her opposition to Skalko's email, Wesleyan, as noted, has advanced legitimate, non-discriminatory reasons for terminating Shelley.  Docs. 28-1 at 12; 28-2 ¶¶ 14, 18, 19, 21, 22, 23, 24, 25, 26, 27.  And Shelley fails to provide any evidence, direct or circumstantial, showing those well-documented reasons are pretextual.  Docs. 28-2 ¶¶ 26-27; 38-7 at 14-20, 22-25.

Thus, Wesleyan is entitled to summary judgment on Shelley's retaliation claim.

**C.   Hostile Work Environment**

Wesleyan liberally construes Shelley's complaint to raise a hostile work environment claim.  It does not.  For a pro se litigant, Shelley has proved herself to be quite sophisticated, and her complaint clearly states claims only for race discrimination

and retaliation.  For her "causes of action," she lists "race discrimination and retaliation in termination."  Doc. 1 at 2.  Consistent with that, Shelley only alleges that she filed with the EEOC charges of "discrimination (race, retaliation)."  *Id.* ¶ 13.  And her complaint seeks damages for "wages she would have received in the absence of race discrimination and retaliation."  *Id.* at 9.  Although her complaint contains the words "hostile work environment," that language was employed to support her claim that she was terminated for raising issues of bullying and harassment.  *Id.* ¶¶ 14, 15, 34. Nevertheless, the Court will address, as Wesleyan did, a hostile work environment claim that Shelley did not assert.

To establish a prima facie case for a hostile work environment claim, a plaintiff must prove that (1) she is a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment complained of was based on her race or gender, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment, and (5) there is a basis for holding the employer liable.  *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014).  "[T]o be actionable, the harassment must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive."  *Bryant v. Jones,* 575 F.3d 1281, 1297 (11th Cir. 2009) (internal quotation marks and citation omitted).

When evaluating whether the harassment is sufficiently severe or pervasive, the Court looks at the totality of the circumstances and considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance." *Freeman v. City of Riverdale*, 330 F. App'x 863, 865 (11th Cir. 2009) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)).  Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult.  *Miller,* 277 F.3d at 1276-77; *see also Smithers v. Wynne,* 319 F. App'x 755 (11th Cir. 2008) (citing *Miller* and stating same).  It is not sufficient to merely highlight a couple of utterances as evidence of a hostile work environment.  The Supreme Court has noted that "teasing, offhand comments, and isolated incidents" do not constitute discriminatory changes in terms and conditions of employment.  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal citation and quotation marks omitted).

In other words, the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.  Compare Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) (seven incidents of racist acts, including several co-workers wearing clothes bearing the Confederate flag on the same days and leaving bananas in the plaintiff's truck, could be considered "as threatening confrontation" and, thus, was severe and pervasive behavior); *Miller*, 277 F.3d 1269 (behavior was severe and pervasive when ethnic slurs were directed towards the plaintiff three to four times a day while the plaintiff was trying to perform his work duties); *with Hall v. Dekalb Cty. Gov't*, 503 F. App'x 781 (11th Cir. 2013) (behavior was "improper," but did not rise to the level of severity or pervasiveness necessary to sustain a hostile work environment claim, when a co-worker referred to the plaintiff as "boy" and, when the plaintiff reported this comment, his supervisor laughed); *Smithers*, 319 F. App'x 755 (behavior was not severe and pervasive when plaintiff's supervisor allegedly

made negative comments about the plaintiff and the plaintiff thought others in the office were gossiping about him); *Satchel v. Sch. Bd. of Hillsborough Cty.*, 251 F. App'x 626 (11th Cir. 2007) (it was not objectively reasonable for the plaintiff to perceive "workplace disputes" as severe enough to constitute a hostile work environment claim).  *See also Mendoza v. Borden*, *Inc.*, 195 F.3d 1238 (11th Cir. 1999) (behavior was not severe and pervasive to sustain a hostile work environment claim based on sexual harassment when the plaintiff's supervisor rubbed his hip against the plaintiff's hip while touching her arm and smiling, stared at the plaintiff's groin area three times, and constantly followed and stared at the plaintiff).[11]

In a one-paragraph section in her response brief, Shelley argues, in conclusory fashion, that she has shown evidence of a hostile work environment.  Doc. 37 at 16.  For example, Shelley argues that "Skalko was persuasive in her recruitment to involve the entire staff in her efforts to harass [Shelley]."[12]  *Id.*  Shelley also argues that she was "segregated" from her co-workers and that Skalko encouraged other employees to stop speaking to Shelley.  *Id.*  To take the most severe allegation, Shelley claims Skalko threw a box at Shelley's feet and asked her to take it to a conference room.  Doc. 28-10 at 27:23-29:5.  While Skalko's alleged behavior was rude and unpleasant, it does not cross the demanding threshold of a hostile work environment claim.  Also, Shelley never claimed that Skalko acted out of racial animus.  *Id.*

---

[11] "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."  *AMTRAK v. Morgan*, 536 U.S. 101, 116 n.10 (2002).

[12] This paragraph also references Shelley's well-after-the-fact claim that a co-worker called Shelley a "Harriett Tubman, Aunt Jemima wanna be," which, as discussed above, the Court will not consider.

Shelley also claims Skalko's emails are evidence of pervasive harassment.  Doc. 38-7 at 14-25.  Of course, these are the emails documenting, again from Skalko's perspective, Shelley's numerous deficiencies.  Doc. 38-7 at 14, 16-20, 22-25.  To the extent Shelley saw the emails before her termination (some were not addressed to her), she likely was not happy, but Skalko's criticisms, which make no reference to race, clearly do not rise to the level necessary to support a hostile work environment claim.[13]

In short, nothing cited by Shelley constitutes the sort of "severe or pervasive" race-based harassment necessary to support a hostile work environment claim.  Thus, if Shelley had alleged in her complaint a hostile work environment claim, Wesleyan would be entitled to summary judgment on that claim.[14]

## IV. CONCLUSION

For the reasons discussed above, Wesleyan's motion for summary judgment (Doc. 28) is **GRANTED**.

**SO ORDERED**, this 14th day of January, 2021.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[13] As discussed, Shelley has put in the record documents discussing Wesleyan's history regarding race. Doc. 37-5 at 48-98.  Shelley asks the Court to consider Wesleyan's history as evidence of a hostile work environment and discriminatory treatment.  But Shelley fails to prove how Wesleyan's history is relevant to *her* allegations.  If anything, the articles highlight Wesleyan's efforts to correct past errors.  *Id.*

[14] The Court recognizes that successfully navigating *McDonnell Douglas* is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A plaintiff can always avoid summary judgment by creating a triable issue concerning the employer's discriminatory intent.  A plaintiff can do this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).  However, for reasons discussed throughout this Order, Shelley has not presented "a convincing mosaic of circumstantial evidence" that Wesleyan acted with discriminatory intent.